STEVEN T. GUBNER - Bar No. 156593
DAVID M. POITRAS – Bar No. 141309
JASON B. KOMORSKY - Bar No. 155677
RYAN F. COY – Bar No. 324939
BG LAW LLP
21650 Oxnard Street, Suite 500
Woodland Hills, CA 91367
Telephone: (818) 827-9000
Facsimile:  (818) 827-9099
Email:      sgubner@bg.law
            dpoitras@bg.law
            jkomorsky@bg.law
            rcoy@bg.law

Special Counsel for Plaintiff James Gansman,
solely in his capacity as liquidating trustee
of the Sedgwick LLP Liquidating Trust

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| JAMES GANSMAN, Liquidating Trustee of the Sedgwick LLP Liquidating Trust,<br><br>    Plaintiff,<br>v.<br><br>MICHAEL A. TANENBAUM,<br><br>    Defendant. | Case No. 23-cv-03667-BLF<br>(Consolidated with No. 23-cv-03671)<br><br>**PLAINTIFF LIQUIDATING TRUSTEE'S TRIAL BRIEF**<br><br>Trial Start Date:<br>Date:   March 25, 2024<br>Time:  9:00 a.m.<br>Place:  Courtroom 1<br>         280 South 1st Street<br>         San Jose, CA 95113 |
| JAMES GANSMAN, Liquidating Trustee of the Sedgwick LLP Liquidating Trust,<br><br>    Plaintiff,<br>v.<br><br>JAMES KEALE,<br><br>    Defendant. | |

2972468_2

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ..................................................................................................................1

II. ADMITTED FACTUAL BACKGROUND .........................................................................4

III. LEGAL ANALYSIS OF AVOIDANCE CLAIMS AND EXPECTED EVIDENCE FOR TRIAL ..............................................................................................................................5

    A. Plaintiff's Burden of Proof..........................................................................................5

    B. Legal Standard of "Insolvency"..................................................................................5

    C. Sedgwick was Insolvent in January 2017. .................................................................8

    D. Claim Nos. 2 and 3 – The Distributions to Defendants Should Be Returned for the Benefit of the Estate. ......................................................................................11

    E. Claim No. 4 – The Constructive Fraudulent Transfers to the Defendants Should Be Avoided and Recovered for the Benefit of the Estate. ..........................12

    F. Claim No. 6 – Recovery of Avoided Transfers Under 11 U.S.C. §§ 544, 550 and Cal. Civ. Code § 3439.07 ..................................................................................14

IV. CONCLUDING REMARKS ...............................................................................................15

# **TABLE OF AUTHORITIES**

Page

**CASES**

*Akers v. Koubourlis (In re Koubourlis)*,
   869 F.2d 1319 (9th Cir. 1989) .................................................................................................. 7

*In re Adelphia Comm'ns Corp.*,
   652 F. App'x 19 (2d Cir. 2016) ................................................................................................. 7

*In re AFI Holding, Inc.*,
   525 F.3d 700 (9th Cir. 2008) .................................................................................................. 13

*In re Agricultural Research and Tech. Grp., Inc.*,
   916 F.2d 528 (9th Cir. 1990) .................................................................................................. 13

*In re AWTR Liquidation Inc.*,
   548 B.R. 300 (Bankr. C.D. Cal. 2016) ...................................................................................... 7

*In re Richmond Produce Co., Inc.*,
   151 B.R. 1012 (Bankr. N.D. Cal. 1993),
   *aff'd,* 195 B.R. 455 (N.D. Cal. 1996) .................................................................................... 6, 7

*In re Sierra Steel, Inc.*,
   96 B.R. 275 (B.A.P. 9th Cir. 1989) ........................................................................................... 7

*In re Waccmaw's Homeplace*,
   325 B.R. 524 (Bankr. D. Del. 2005) .......................................................................................... 6

*In re Walldesign, Inc.*,
   No. 16-01346, 2017 WL 1228397 (C.D. Cal. Mar. 31, 2017) ................................................... 6

*In re Winstar Communications, Inc.*,
   348 B.R. 234 (Bankr. D. Del. 2005) ...................................................................................... 6, 7

*Lids Corp. v. Marathon Inv. Partners, L.P. (In re Lids Corp.)*,
   281 B.R. 535 (Bankr. D. Del. 2002) .......................................................................................... 7

*Matter of Lamar Haddox Contractor, Inc.*,
   40 F3d 118 (5th Cir. 1994) ........................................................................................................ 7

*MFS/Sun Life Tr.-High Yield Series v. Van Dusen Airport Servs. Co.*,
   910 F. Supp. 913 (S.D.N.Y. 1995) ............................................................................................ 7

*Moody v. Sec. Pac. Bus. Credit, Inc.*,
   971 F.2d 1056 (3d Cir. 1992) .................................................................................................... 7

*Weinman v. Walker (In re Adam Aircraft Indus., Inc.)*,
   510 B.R. 342 (B.A.P. 10th Cir. 2014) ....................................................................................... 6

## TABLE OF AUTHORITIES (cont'd)

Page

**STATUTES**

11 U.S.C. ,
   Section 101(32)(B) ............................................................................................................... 5

11 U.S.C.,
   Section 550 ..................................................................................................................... 1, 14

11 U.S.C.,
   Section 101(15) .................................................................................................................. 13

11 U.S.C.,
   Section 101(32)(A) ............................................................................................................... 5

11 U.S.C.,
   Section 544 ..................................................................................................................... 1, 15

11 U.S.C.,
   Section 547 .......................................................................................................................... 1

11 U.S.C.,
   Section 548 ..................................................................................................... 1, 12, 13, 14

11 U.S.C.,
   Section 548(a)(1)(B)(ii)(I) ................................................................................................... 6

California Civil Code,
   Section 3439.02(a) ............................................................................................................... 6

California Civil Code,
   Section 3439.02(c) ............................................................................................................... 6

California Civil Code,
   Section 3439.04(a)(2)(A) ..................................................................................................... 6

California Civil Code,
   Section 3439.07 ................................................................................................................. 15

California Corporations Code,
   Section 16957(a) ........................................................................................................... 1, 11

**OTHER AUTHORITIES**

Uniform Fraudulent Transfer Act,
   Section 3, comment 2, 7A U.L.A. 639 (1985) ................................................................... 13

**TO THE HONORABLE BETH LABSON FREEMAN, DISTRICT COURT JUDGE OF THE UNITED STATES DISTRICT COURT:**

Plaintiff James Gansman, the Liquidating Trustee (the "Trustee" or "Plaintiff") of the Sedgwick LLP Liquidating Trust, hereby submits his trial brief regarding the claims for return of distributions and avoidance and recovery of constructive fraudulent transfers against the defendants James Keale ("Keale") and Michael Tanenbaum ("Tanenbaum," together with Keale, the "Defendants"). The Trustee brought these actions against the Defendants to recover funds that were paid as returns of capital to them in 2017 after Sedgwick LLP ("Sedgwick" or the "Debtor") was insolvent and had unreasonably small capital. These causes of action were brought under Cal. Corp. Code § 16957(a), and 11 U.S.C. §§ 544, 547,[1] 548, and 550.

Most of the facts in this case are undisputed, but the three main issues to be determined by the Court at trial are (1) the date that Sedgwick was considered "insolvent" under a "fair valuation" analysis; (2) the date that Sedgwick had unreasonably small capital or was "doomed to fail"; and (3) if Sedgwick were to be dissolved (*i.e.*, liquidated) at the time of any or all of the distributions, would its total assets be less than its total liabilities plus the amount needed to satisfy the rights to distributions of other preferential partners that are superior to the rights of the Defendants. The Trustee will demonstrate through trial that Sedgwick was insolvent and had unreasonably small capital as of January 9, 2017—the undisputed date when the most profitable and third most profitable offices at Sedgwick, accounting for 46% of the firm's net income, announced their *en masse* departures from the firm led by seven equity partners (the Defendants among them).

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.     INTRODUCTION**

Large law firms are uniquely fragile from a business perspective and different from most large businesses in America because of their ownership structure. Most large businesses in America tend to be owned by their investors; whereas, law firms are owned by their workers—partners own the equity of the law firm and get paid in shares of its profits, while bearing the risk of any losses. The

---

[1] The Trustee has decided not to pursue the claim for avoidance of preferential transfer under § 547.

partners of a law firm are extraordinarily valuable human capital to the firm, as investors, workers, mentors, supervisors, and business generators, in a way that is unlike other large businesses.

When one partner leaves a law firm, especially a national law firm like Sedgwick and provides proper notice under the governing partnership agreement, the firm can institute measures (such as contacting existing clients to maintain the relationship and having remaining partners fill the gap of that departing partner), which efforts may lessen the financial effect of such departure. In fact, partnership agreements routinely require significant withdrawal notice and, further, prohibit partners from soliciting each other and clients prior to announcing their departures, as Sedgwick's partnership agreement provided. This provision is designed to prevent a sudden, mass defection of partners for reasons made obvious below.

When partners leave *en masse*, as happened here, the partners' withdrawal can have a seismic impact on the firm's profits, which then causes a domino effect adversely impacting the remaining partners' compensation, causing a further exodus of partners and leading to further decline in profits and value to the remaining partners. Partners tend to leave when they see financial decline on the horizon—no person wants to be the last one onboard a sinking ship.

Critically, the two defendants here, Tanenbaum and Keale, worked for months with another former defendant Thomas Robertson, to plan their mass departure from the firm. They did so without providing the requisite notice to the firm required under the partnership agreement before they engaged in their concerted effort to leave. They took these extraordinary steps to ensure the profitability of their new venture—Tanenbaum Keale LLP—while still partners of Sedgwick, while depriving Sedgwick of any ability to institute mitigating measures. Their concerted efforts all but guaranteed Sedgwick's demise. As framed by the bankruptcy court:

> On January 5, 2017, Mr. Tanenbaum and most of the other partners in Sedgwick's Newark office departed en masse, along with associate attorneys and staff. This left just three attorneys in that office and forced its closure. Two days later, on January 7, 2017, the majority of attorneys departed Sedgwick's Dallas, Texas office in similar fashion.
>
> The foregoing defections resulted in the loss of partners responsible for 46% of Sedgwick's annual net income, which dealt a fatal blow to the firm's viability as a going concern.

Docket No. 2 and Bankr. Docket No. 66, Certification of Readiness for Trial, at 2:16-24.

Thus, this was not one partner announcing he was leaving but the choreographed, simultaneous announcement that the three partners in charge of the New Jersey office (the single most profitable Sedgwick office) were leaving together and taking all (except three) of the office's employees. By working together, the New Jersey partners ensured that they would be able to take all of the New Jersey office's business. As Mr. Keale testified, 100% of the business for his new firm with Mr. Tanenbaum and Mr. Robertson came from Sedgwick clients. The fallout from the New Jersey office's announced mass exodus was immediate. Within a day, the partners in charge of Sedgwick's third most profitable office, Dallas, announced their departure for the same date as the New Jersey withdrawal and also taking substantially all of the Dallas office's employees and clients.

The writing was on the wall. If Sedgwick LLP was a ship, then it hit an iceberg on January 9, 2017 (the date formal notice of withdrawal was provided by these partners). In 2016, only three out of sixteen offices at Sedgwick were significantly profitable: San Francisco, Dallas, and Newark. By January 9, 2017, the seven equity partners who were in charge of the Dallas and Newark offices had given notice to the Debtor's executive committee of their departure and withdrawal from Sedgwick by the end of January 2017. Most of the partners, associates, and staff who worked in the Dallas and Newark offices subsequently departed with those seven equity partners. Indisputably, the departure of the Dallas and Newark offices represented approximately 46% of Sedgwick's profits, which Sedgwick knew, as of January 9, 2017, constituted revenues that would be lost in the near future, as mass departures (unlike single partner departures) made it far more difficult to retain clients for whom the departing partners perform work or to replace the revenues the firm knew it would be losing in the near term. The abrupt substantial loss of revenue and profits caused by the concerted efforts of the Defendants—without the kind of heads up required in the partnership agreement that would have allowed Sedgwick to seek to retain some of the partners, employees, and clients, as well as avoid the other resulting damage to the partnership's morale and reputation—sank the firm with a "fatal blow."

Despite the apparent best efforts of Sedgwick's leadership, there was nothing that could stop Sedgwick from sinking—especially as the Debtor faced a spiraling decline with partner departures and office closures. It was known and knowable at the time of the announcement of the Dallas and

3

2972468_2

Newark offices that, without some miracle, Sedgwick was doomed to fail and would not be able to recover.  As of January 9, 2017 and continuously thereafter, Sedgwick had unreasonably small capital (including human capital) to survive as a going concern business.  The loss of so many equity partners placed Sedgwick in default of loan covenants, and efforts to right the ship, such as the immediate reduction of equity partner's distributions, only served to create more defections.  What should not be lost on the Court is that while Tanenbaum and Keale received over $1 million from the Debtor in returned capital in 2017, the Sedgwick partners who remained and fought for Sedgwick's survival received almost nothing.  The evidence will show that under a fair valuation of Sedgwick's assets and liabilities, Sedgwick was rendered insolvent on January 9, 2017 through the departures of the Dallas and Newark offices.

## II.    ADMITTED FACTUAL BACKGROUND[2]

The Debtor filed its bankruptcy case on October 2, 2018 (the "Petition Date").  In the Debtor's amended bankruptcy schedules, the Debtor scheduled assets of $3,528,809.69 and liabilities of $69,308,897.99. The total scheduled liabilities for lease claims were $66.2 million.  In the bankruptcy case, the total amount of lease claims filed against the Debtor's estate was approximately $40.4 million, with $35.1 million related to office lease claims and $5.3 million related to office equipment lease claims.  The total amount of claims filed against the Debtor's bankruptcy estate to date is approximately $46.1 million.

On January 9, 2017, seven equity partners, including the Defendants, provided formal notice to the Debtor that they were withdrawing from the firm.  Along with the seven equity partners, most of the Dallas and Newark offices' non-equity partners, associates, and staff also departed from Sedgwick in January 2017.  The Dallas and Newark offices represented approximately 46% of the Debtor's net income, which was lost in January 2017. Between January to March 2017, eleven equity partners departed the Debtor's partnership as well as non-equity partners, associate attorneys, and staff. Management of the Debtor estimates that annual revenue related to the departing attorneys was approximately $38 million, or approximately 25% of the 2016 revenue.

---

[2] *Joint Pretrial Statement*, Docket No. 15.

By March 31, 2017, the Debtor's internal financial statements indicated that the Debtor's total cash dropped by over 70% to approximately $2.9 million, where it had been in the range of $10 million to $20 million at all relevant times before. By December 31, 2017, the Debtor's actual cash-based 2017 revenue was down $52.7 million or 31.5% vs. 2016, per the CPA reviewed financials. The internal financial statements indicate that the firm had 2017 losses of approximately $14.3 million on a modified accrual basis, and lost money during most months in 2017.

The Defendants are each an "insider" of the Debtor, as defined by 11 U.S.C. § 101(31)(C). During 2017, Tanenbaum received $957,033.40 in distributions from Debtor, which are returns of capital based on equity. During 2017, Keale received $261,679.01 in distributions from Debtor, which are returns of capital based on equity.

## III. LEGAL ANALYSIS OF AVOIDANCE CLAIMS AND EXPECTED EVIDENCE FOR TRIAL

### A. Plaintiff's Burden of Proof

At trial, the Trustee will bear the burden of proof to prove his claims by a preponderance of the evidence. *See In re 3dfx Interactive, Inc.*, 389 B.R. 842, 863-64 (Bankr. N.D. Cal. 2008). The Trustee will exceed his burden and will demonstrate that the distributions to the Defendants as insiders should be avoided as returns of distributions under California law and as constructive fraudulent transfers under the Bankruptcy Code, which are recoverable for the benefit of the creditors of the Debtor's estate/liquidating trust.

### B. Legal Standard of "Insolvency"

Under the Bankruptcy Code and with reference to a partnership, the term "insolvent" means "financial condition such that the sum of such partnership's debts is greater than the aggregate of, at a fair valuation--

> (i) all of such partnership's property, exclusive of property [transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors]; and
>
> (ii) the sum of the excess of the value of each general partner's nonpartnership property, exclusive of property [that is fraudulently transferred or that is exempt], over such partner's nonpartnership debts.

11 U.S.C. § 101(32)(B); *see also* 11 U.S.C. § 101(32)(A) (showing the same definition for

5

corporations and other business entities). Since Sedgwick does not have a general partner, the financial condition or insolvency is solely based on the partnership debts and property. Under California law, the definition is roughly the same. Cal. Civ. Code § 3439.02(a) ("A debtor is insolvent if, at fair valuations, the sum of the debtor's debts is greater than all of the debtor's assets.").

"For purposes of 11 U.S.C. § 548(a)(1)(B)(ii)(I), insolvency is determined using a 'balance sheet test,' meaning the debtor's liabilities exceed its assets at fair valuation." *Weinman v. Walker (In re Adam Aircraft Indus., Inc.)*, 510 B.R. 342, 352-53 (B.A.P. 10th Cir. 2014). For the return of distributions claims under California law, insolvency can be determined by the application of one of three tests: (1) "the sum of the debtor's debts is greater than all of the debtor's assets" at fair valuations, *aka* "balance sheet test," Cal. Civ. Code § 3439.02(a); (2) "[a] debtor who is generally not paying his or her debts as they become due is presumed to be insolvent," Cal. Civ. Code § 3439.02(c); and (3) a determination of whether the debtor "was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction," Cal. Civ. Code § 3439.04(a)(2)(A). *See In re Walldesign, Inc.*, No. 16-01346, 2017 WL 1228397, at *8 (C.D. Cal. Mar. 31, 2017) (identifying the three fair value tests for determining insolvency under California law).

The "balance sheet test" contemplates a "fair valuation" for the respective assets and liabilities, as opposed to what is specifically listed on the debtor's balance sheet under generally accepted accounting principles ("GAAP"). California law "is clear that 'fair valuation' rather than GAAP is the appropriate methodology to employ in a determination of insolvency." *In re Walldesign*, 2017 WL 1228397, at *9; *see also In re Richmond Produce Co., Inc.*, 151 B.R. 1012, 1019 (Bankr. N.D. Cal. 1993), *aff'd,* 195 B.R. 455 (N.D. Cal. 1996) (explaining that generally accepted accounting principles do not control the determination of solvency because certain assets that are recognized under GAAP cannot be sold to satisfy a creditor's claim, and thus are not a component of fair value analysis); *In re Waccmaw's Homeplace*, 325 B.R. 524, 529 (Bankr. D. Del. 2005) ("Accounting conventions are not the controlling principles for the legal determination of whether a debtor's debts exceed the fair value of its assets for purposes of insolvency.") (citations omitted); *In re Winstar Communications, Inc.*, 348 B.R. 234, 274 (Bankr. D. Del. 2005)

6

("[A]lthough labeled as the 'balance sheet' test, as Judge [Walrath] noted 'this may be a misnomer because the Balance sheet Test is based upon a fair valuation and not based on Generally Accepted Accounting Principles ('GAAP'), which are used to prepare a typical balance sheet.'") (quoting *Lids Corp. v. Marathon Inv. Partners, L.P. (In re Lids Corp.)*, 281 B.R. 535, 540 (Bankr. D. Del. 2002)); *Matter of Lamar Haddox Contractor, Inc.*, 40 F3d 118, 121-22 (5th Cir. 1994) (evidence of book value does not establish the fair market value of the debtor's assets).

Under "fair value," "the inquiry must be to what extent an asset would have value for a creditor attempting to satisfy its claim." *In re Richmond Produce Co.*, 151 B.R. at 1019 (stating that GAAP do not control the determination of solvency because there are assets included under GAAP that cannot be sold to satisfy claims of creditors); *see also In re Sierra Steel, Inc.*, 96 B.R. 275, 278 (B.A.P. 9th Cir. 1989) (stating that GAAP does not control or determine insolvency questions because "[c]learly the [Bankruptcy] Code provides that judges should make such decisions"); *In re Winstar*, 348 B.R. at 274 ("Fair valuation is generally interpreted as fair market value, that is the amount a hypothetical willing buyer would pay to a willing seller, rather than a distressed or liquidation value."); *Akers v. Koubourlis (In re Koubourlis)*, 869 F.2d 1319, 1321 (9th Cir. 1989) ( "This definition of insolvency is the traditional bankruptcy balance sheet test of insolvency: whether debts are greater than assets, at a fair evaluation, exclusive of exempted property.").

"[C]ourts have interpreted the term [unreasonably small] to describe a situation where a transaction leaves a debtor 'technically solvent but doomed to fail.'" *In re Adelphia Comm'ns Corp.*, 652 F. App'x 19, 21 (2d Cir. 2016) (quoting *MFS/Sun Life Tr.-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 944 (S.D.N.Y. 1995)) (citing *Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1073 (3d Cir. 1992)). "The test for whether assets are 'unreasonably small' focuses on reasonable foreseeability." *Adelphia Comm'ns*, 652 F. App'x at 21 (quoting *Moody*, 971 F.2d at 1073); *see also In re AWTR Liquidation Inc.*, 548 B.R. 300, 312-13 (Bankr. C.D. Cal. 2016) ("'test for unreasonably small capital is reasonable foreseeability' that lack of capital would lead to an 'inability to generate enough cash flow to sustain operations'") (quoting *Moody*, 971 F.2d at 1073).

7

### C.     Sedgwick was Insolvent in January 2017.

From 2013 through 2016, Sedgwick's CPA reviewed financial statements demonstrate that the firm was in a steady decline. In October 2016, Sedgwick's Chief Operations Officer (COO) acknowledged that year-to-date net income for the firm was down 18% compared to the revised budget projection, specifically indicating that billed hours, fee income, and net income for September 2016 were all lower than the revised (i.e., reduced) monthly budget projections. The COO also emphasized that in 2016 there was weak demand growth, that "hours per lawyer decrease[d] across all timekeeper categories," and that law firm "expenses are on the increase."

In October 2016, the Debtor reduced payments to retired equity partners by approximately 82.6% for the months of October, November, and December 2016, by deferring the obligations owed to future years. On November 13, 2016, Defendant Keale, who was on the Debtor's executive committee, emailed Sedgwick's Chairman, Michael Healy, proposing a list of "immediate action items" to address with the firm's partnership, including multiple ways to change compensation and suggesting that the partnership should "[a]mend the partnership agreement to terminate any future retirement benefits" because the partnership "cannot afford the obligation we owe so we need to prevent any further growth in that obligation." On December 12, 2016, Sedgwick's primary lender, Citibank, N.A., notified the firm that it was waiving Sedgwick's anticipated violation of a loan covenant requiring minimum amounts for cash flow in 2016—Sedgwick did not have cash flow of at least $30 million or at least 85% of the cash flow for the immediately preceding fiscal year.

On January 9, 2017, the Dallas and Newark equity partners gave notice to the Debtor's executive committee that they were all withdrawing from Sedgwick the same month. Almost all partners, associates, and staff in the Dallas and Newark offices left with the equity partners. The Dallas and Newark offices together accounted for over 46% of the Debtor's net income at that time.

In addition to the undisputed facts, the Debtor's financial statements, and deposition testimony of former partners at Sedgwick, the Trustee will primarily demonstrate the date of Sedgwick's insolvency through the expert testimony of Austin Wade, who is an expert in forensic accounting as a Certified Public Accountant, a Certified Fraud Examiner, and is "Accredited in Business Valuation" by the American Institute of Certified Public Accountants.

8

Mr. Wade conducted a ground-up comprehensive solvency analysis of Sedgwick by reviewing and analyzing the available books and records of Sedgwick, independent market research, and pertinent deposition testimony. Mr. Wade is expected to testify that Sedgwick was in a slow decline from 2013 to 2016, as its income decreased by 7% per year on average, and then significantly declined by 31.6% in 2017. Mr. Wade is expected to testify that despite being in a slow decline from 2013 to 2016, Sedgwick was not destined for failure until January 2017 when the Newark and Dallas partners and offices left the firm—creating a gaping and insurmountable hole in the Debtor's income, causing the Debtor to produce consistent losses on a modified accrual basis in January 2017 and thereafter.

Mr. Wade will testify about the annual average distributions per equity partner, which show that in 2013 the active equity partners received cash distributions of $749,858 on average, and equity partner distributions declined 10% each year for 2014, 2015, and 2016, such that the annual average distributions per equity partner was $536,834 in 2016. In 2017, average equity partner distributions were $376,378. This significant reduction in a matter of a few years was a substantial cause for concern and led equity partners to leave the firm in search of new more lucrative opportunities.

Mr. Wade will discuss his analysis of the Debtor's assets and liabilities at a fair valuation. Mr. Wade will testify that he used a "going concern" premise of value to assess the Debtor's solvency, which means that the business is expected to operate into the future, as opposed to a liquidation or distressed value, where the assets would be significantly discounted by estimated liquidation costs and less exposure to the market to arrive at fair market value. Mr. Wade will explain that "going concern value" is a conservative assessment for assessing solvency in avoidance actions like this one, even though Sedgwick was experiencing severe financial difficulties and was likely doomed to fail with unreasonably small capital on and after January 9, 2017.

Mr. Wade's solvency analysis will show that the Debtor was insolvent as of January 9, 2017, following the departure of the Newark and Dallas offices, based on the fair value of the Debtor's assets and liabilities. Mr. Wade will discuss that he started with the book value of assets and liabilities as listed in the Debtor's internal financial statements before making adjustments for "fair value" depending on the asset or liability.

The Debtor's largest liabilities were office equipment leases, retired partner obligations, and office lease obligations.  For office equipment lease liability, Mr. Wade valued this amount as 100% of the gross amount as listed in the Debtor's financial statements, which was approximately $5.64 million. For retired partner obligations, the Debtor's financial statements purported to "terminate" these obligations at the end of 2017 when the firm decided to dissolve; however, as Mr. Wade will explain, if the Debtor intended to operate as a going concern entity, then it would have had to pay out these promised retirement payments in order to keep the firm viable on an ongoing basis.  The partnership agreement provides that the firm can defer payments to retired partners if such payments are more than 5% of Sedgwick's net income; however, these retirement obligations would not disappear—they would just be deferred until they can be paid at a later date. The total amount of the retired partner obligations was $22,216,897 in January 2017.  Last, but not least, is the Debtor's office lease liabilities.  The December 31, 2017 reviewed financial statements show total future lease obligations of $69,481,730, noting that the firm will not be able to make all of its future lease payments.  In January 2017, the book value of the office lease liabilities was over $90 million per the financial statements; however, Mr. Wade discounted the total office lease liability by 50% of the gross amount.  Even though the Debtor was in serious decline, had more office space than it could use, and was likely unable to pay its rents into the future, Mr. Wade did not include 100% of the amount of the office lease liabilities because it was likely that the Debtor could mitigate some of the lease expenses by subleasing space, assigning the leases to another law firm or tenant, or by negotiating with the landlords for a buyout or reduction in the obligations.  Based on Mr. Wade's analysis and opinions, the Debtor may be able to make back approximately 50 cents for each dollar of liability if it could sublet space or find a hypothetical willing buyer. Even if the office lease liabilities were only valued at approximately 10-20% of the total amount of the liabilities, the Debtor was still insolvent in January 2017.

After Mr. Wade's balance sheet test adjustments to account for the "fair valuation" of the assts and liabilities, in January 2017, the Debtor's total assets were $39,659,206 less than the Debtor's total liabilities—meaning the Debtor was insolvent by over $39 million.  Mr. Wade also analyzed the Debtor's solvency as of June 30, 2017 and December 31, 2017—finding the Debtor's

insolvency worsened during 2017. Mr. Wade found that the Debtor was insolvent in January 2017 under the balance sheet test approach, the income approach, and the market approach to analyzing the fair value of the Debtor's financial condition.

Mr. Wade will testify and the evidence will show that the firm's financial condition was in a steady decline between 2013 and 2016, until January 2017 when the firm's condition and income projections imploded with the loss of two of the firm's most profitable offices. The Newark and Dallas offices' withdrawal in January 2017 triggered an additional spiral of partner departures, as equity partners saw the substantial reduction in profits, revenue, and value of the partnership. By November 2017, close to half of the equity partners of Sedgwick withdrew from the firm in 2017. On December 1, 2017, the firm's remaining equity partners voted to dissolve the firm (approximately 10 months from the loss of the Dallas and Newark offices), and on December 31, 2017, Sedgwick closed its business.

The testimony and evidence will show that the Debtor was insolvent in January 2017 upon the announcement of the withdrawals of the Newark and Dallas offices.

### D. Claim Nos. 2 and 3 – The Distributions to Defendants Should Be Returned for the Benefit of the Estate.

The Trustee's second and third claims for relief for return of distributions against the Defendants are brought under Cal. Corp. Code § 16957(a)(1)-(2). The elements of the claim under Cal. Corp. Code § 16957(a)(1) are that after giving effect to the respective distribution, the Debtor "would not be able to pay its debts as they become due in the usual course of business." § 16957(a)(1). The elements of the claim under Cal. Corp. Code § 16957(a)(2) are that after giving effect to the respective distribution, the Debtor was insolvent or the Debtor's "total assets would be less than the sum of its total liabilities plus the amount that would be needed, if the [Debtor] were to be dissolved at the time of the distribution, to satisfy the preferential rights of other partners upon dissolution that are superior to the rights of the partners receiving the distribution." § 16957(a)(2).

Both of these claims are supported by Mr. Wade's testimony and the other evidence to be presented at trial. The loss of the Newark and Dallas offices meant that the Debtor "would not be able to pay its debts as they become due in the usual course of business." § 16957(a)(1). Under §

11

16957(a)(2), the Debtor was insolvent as of January 9, 2017; however, more notably is the second part to subdivision (a)(2), which states that the analysis is "if the [Debtor] were to be dissolved at the time of the distribution." § 16957(a)(2). Mr. Wade will explain and testify that his opinions regarding the Debtor's insolvency in January 2017 is based on a "going concern" premise of value; however, if the Debtor were to be "dissolved" on January 13, 2017 (the date of the first distribution sought to be recovered), then the Debtor would be even more insolvent because dissolution as of that date is more akin to a liquidation value, where assets would be more heavily discounted than the "fair market value" analysis conducted by Mr. Wade.  The Debtor was not able to satisfy the superior rights of creditors when it eventually did dissolve.

Since the Debtor's total assets were less than the sum of its total liabilities, if the Debtor were to be dissolved (*i.e.*, liquidated) on the date of each of the distributions in question, the Defendants should be required to return each of the distributions they received in 2017.  The Court should find in favor of the Trustee on his second and third claims for relief, requiring Tanenbaum to return $957,033.40 in distributions and requiring Keale to return $261,679.01 in distributions that they received, respectively, in 2017.

### E. Claim No. 4 – The Constructive Fraudulent Transfers to the Defendants Should Be Avoided and Recovered for the Benefit of the Estate.

The Trustee's fourth claim for relief seeks to avoid and recover the constructive fraudulent transfers from the Debtor to the Defendants. 11 U.S.C. § 548. The elements for constructively fraudulent transfers under 11 U.S.C. § 548(a)(1)(B) are that the Plaintiff may avoid the distributions made within two years of the Debtor's petition date, if the Debtor voluntarily or involuntarily:

> (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; **AND**
>
> (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
>
> (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;
>
> (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; **OR**

12

> (IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. § 548(a)(1)(B) (emphasis added).

      The Trustee will more than satisfy his burden of proof on the constructive fraudulent transfer claim. It is undisputed that all of the distributions sought to be avoided occurred within two years of Sedgwick's Petition Date. It is likewise undisputed that Sedgwick received less than reasonably equivalent value in exchange for the distributions to the Defendants, which were based on equity in the limited partnership and are returns of capital. Any argument that the distributions were compensation for services is unsupported by the facts and law because the Trustee is not seeking to avoid the salary payment in January 2017 of $17,000, which was the Defendant's last salary payment before they departed the Debtor.

      "Under the Bankruptcy Code, limited partnership interests are classified as 'equity security.'" *In re Agricultural Research and Tech. Grp., Inc.*, 916 F.2d 528, 540 (9th Cir. 1990) ("*Agretech*") citing 11 U.S.C. § 101(15). If partnership distributions are made on account of the partnership interests, as opposed to being made in exchange for a debt owed to a partner, then as a matter of law the distributions were not "for value." *Agretech*, 916 F.2d at 540. Importantly, the Ninth Circuit observed that the purpose of constructive fraudulent transfer claims is "to protect the creditors" in determining the "value" that is purportedly exchanged. *See id.* ("Any consideration not involving utility for the creditors does not comport with the statutory definition.") citing the Unif. Fraudulent Transfer Act § 3, comment 2, 7A U.L.A. 639, 651 (1985)). "Thus, distributions to limited partners is not value because any other definition would not further protection of creditors." *Agretech* at 540. Under binding Ninth Circuit case law, the court has "held that a distribution on account of a partnership interest relative to an investor's capital contribution was not 'reasonably equivalent value' as defined by the Bankruptcy Code." *In re AFI Holding, Inc.*, 525 F.3d 700, 704 (9th Cir. 2008) (citing *Agretech* at 540).

      Since it is undisputed as a matter of law that Sedgwick did not receive reasonably equivalent value in exchange for the distributions to Defendants, the Trustee only needs to show one of the following disjunctive elements by a preponderance of the evidence in order to satisfy the burden of

13

proof that the distributions were constructive fraudulent transfers: (1) the Debtor was insolvent on the date of the first distribution in January 2017 and remained insolvent thereafter; (2) the Debtor was engaged in business for which the remaining property of the Debtor as of January 9, 2017 was unreasonably small capital, such that the Debtor was "doomed to fail;" (3) the Debtor intended or believed it would incur debts beyond its ability to pay as the debts matured; and (4) the distributions were made to insiders under an employment contract and not in the ordinary course of business. *See* § 548(a)(1)(B). If the Trustee demonstrates just one of these four elements at trial, then it is proven that the distributions are avoidable under the Bankruptcy Code and recoverable for the benefit of creditors of the Debtor's estate.

As explained in the two preceding subsections, the Trustee will demonstrate that Sedgwick was insolvent as of January 9, 2017. Similarly, with the loss of substantial and influential partners, accounting for 46% of the Debtor's net income, the Debtor was engaged in business for which it now had unreasonably small human capital to survive as an ongoing large national law firm business—the departure of first and third most profitable offices meant Sedgwick was destined for failure as of January 9, 2017. Lastly, it is undisputed that the Defendants were insiders, and it is undisputed that the distributions were paid on account of the Defendants' insider status, *i.e.*, their partnership interests. Notwithstanding insolvency and unreasonably small capital, the Debtor also made some or all of the distributions under employment contracts (*e.g.*, the partnership agreement and the March 2017 confidential agreement) with the Defendants, which were not made in the ordinary course of business. Thus, the Court should award judgment to the Trustee on the constructive fraudulent transfer claims, avoiding the distributions to the Defendants.

**F.     Claim No. 6 – Recovery of Avoided Transfers Under 11 U.S.C. §§ 544, 550 and Cal. Civ. Code § 3439.07**

If the Court finds for the Trustee on Claim Nos. 2, 3, or 4 to avoid the transfers, *i.e.*, ordering a return of the distributions, then the Trustee may obtain recovery of the avoided distributions to the extent necessary to satisfy the liquidating trust's claims on behalf of the Debtor's estate. If the Court enters judgment in favor of the Trustee on one of the three claims to avoid the distributions, then the Trustee may recover the avoided transfers or the value of such transfers. 11 U.S.C. § 550. Since the

admitted facts show that the Defendants were the initial transferees of the distributions, the Trustee is entitled to recover the value of the transfers from each Defendant pursuant to 11 U.S.C. §§ 544, 550 and Cal. Civ. Code § 3439.07.

## IV. CONCLUDING REMARKS

The facts and circumstances of this case demonstrate that judgment should be entered in favor of the Trustee on his claims for relief. The distributions transferred to Tanenbaum and Keale in 2017 should be returned, avoided, and recovered by the Trustee for the benefit of the estate and its creditors. The Defendants will be unable to prove any of their affirmative defenses, and the Defendants' arguments will be unsubstantiated in the face of the evidence and facts admitted at trial.

The bottom line is that the Defendants knew the Debtor was struggling financially, which serves as the reason and their motivation to start their own law firm, taking Sedgwick's employees and clients with them. The problem is that while the Debtor was in a slow decline, the unexpected and sudden loss of 46% of its net income at one time was too much of a financial setback, and despite the efforts of the firm's management to fix the sinking ship, it was impossible to fix the iceberg size hole left by the *en masse* departures in January 2017. Like the Titanic, Sedgwick stayed operating (or afloat) for some time after hitting the proverbial iceberg, but in the end, the result was inevitable—once there was a huge hole in the ship, it was doomed to fail.

For the foregoing reasons, at the end of the trial, the Trustee will ask this Court to find the Defendants liable and to enter judgment in favor of the Trustee on his claims to avoid and recover the distributions to the Defendants in 2017.

Dated: March 18, 2024         BG LAW LLP

                              By: /s/ Ryan F. Coy
                                  DAVID M. POITRAS
                                  JASON B. KOMORSKY
                                  RYAN F. COY
                                  Special Litigation Counsel for Plaintiff, James
                                  Gansman, as liquidating trustee of Sedgwick
                                  Liquidating Trust

15

2972468_2

## CERTIFICATE OF SERVICE

I declare that I am over the age of 18 years and not a party to the within action. I am employed in the County of Los Angeles and my business address is Brutzkus Gubner, 21650 Oxnard Street, Suite 500, Woodland Hills, California 91367.

On **March 18, 2023**, I served the following document(s):

**PLAINTIFF LIQUIDATING TRUSTEE'S TRIAL BRIEF**

On the following:

ALL COUNSEL OF RECORD
(via CM/ECF electronic service list)

☒  By transmitting electronically via CM/ECF the document(s) listed above as set forth on the electronic service list on this date before 11:59 p.m.

☒  By delivering to copies to:

Hon. Judge Freeman, District Court, Northern District, San Jose Courthouse, Courtroom 3 – 5th Floor, 280 South 1st Street, San Jose, California 95113

I declare under penalty of perjury under the laws of the State of California that the above is true and correct. Executed on March 18, 2024, at Woodland Hills, California.

/s/ Abbie Au
ABBIE AU