STEVEN T. GUBNER - Bar No. 156593
DAVID M. POITRAS – Bar No. 141309
JASON B. KOMORSKY - Bar No. 155677
RYAN F. COY – Bar No. 324939
BG LAW LLP
21650 Oxnard Street, Suite 500
Woodland Hills, CA 91367
Telephone:  (818) 827-9000
Facsimile:   (818) 827-9099
Email:      sgubner@bg.law
            dpoitras@bg.law
            jkomorsky@bg.law
            rcoy@bg.law

Special Counsel for Plaintiff James Gansman,
solely in his capacity as liquidating trustee
of the Sedgwick LLP Liquidating Trust

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| JAMES GANSMAN, Liquidating Trustee of the Sedgwick LLP Liquidating Trust, <br><br> Plaintiff, <br><br> v. <br><br> MICHAEL A. TANENBAUM, <br><br> Defendant. | Case No. 23-cv-03667-BLF<br>(Consolidated with No. 23-cv-03671)<br><br>**PLAINTIFF LIQUIDATING TRUSTEE'S POST-TRIAL BRIEF** |
| JAMES GANSMAN, Liquidating Trustee of the Sedgwick LLP Liquidating Trust, <br><br> Plaintiff, <br><br> v. <br><br> JAMES KEALE, <br><br> Defendant. | <u>Trial:</u><br>Date:   March 25-27, 2024<br>Time:  9:00 a.m.<br>Place:  Courtroom 1<br>          280 South 1st Street<br>          San Jose, CA 95113 |

**TO THE HONORABLE BETH LABSON FREEMAN, DISTRICT COURT JUDGE OF THE**

**UNITED STATES DISTRICT COURT:**

2985346_2

# <u>TABLE OF CONTENTS</u>

Page

I.     PARTIES ................................................................................................................1

II.    EVIDENCE PRESENTED AT TRIAL PROVES LIABILITY FOR
       CONSTRUCTIVE FRAUDULENT TRANSFER .................................................1

       A.     Pre-Trial Stipulated Evidence ..................................................................1

       B.     Evidence Presented at Trail .....................................................................4

III.   LEGAL ANALYSIS OF AVOIDANCE CLAIMS..............................................10

       A.     Trustee's Burden of Proof.......................................................................10

       B.     The Undisputed Elements of the Trustee's Constructive Fraudulent Transfer
              Claims.....................................................................................................10

       C.     "Unreasonably Small Capital".................................................................11

       D.     "Insolvency" ...........................................................................................14

IV.    CONCLUDING REMARKS ...............................................................................15

i

# TABLE OF AUTHORITIES

Page

**CASES**

*ASARCO LLC v. Americas Mining Corp.,*
396 B.R. 278 (S.D. Tex. 2008) ........................................................................... 11, 12, 13

*In re 3dfx Interactive, Inc.,*
389 B.R. 842 (Bankr. N.D. Cal. 2008) ............................................................................ 10

*In re AFI Holding, Inc.,*
525 F.3d 700 (9th Cir. 2008) ........................................................................................... 11

*In re Agricultural Research and Tech. Grp., Inc.,*
916 F.2d 528 (9th Cir. 1990) ........................................................................................... 11

*In re AWTR Liquidations, Inc.,*
548 B.R. 300 (Bankr. C.D. Cal. 2016) ............................................................................ 11

*In re Palm Beach Fin. Partners, L.P.,*
598 B.R. 885 (Bankr. S.D. Fla. 2019),
*aff'd,* 616 B.R. 189 (S.D. Fla. 2020) ............................................................................... 11

*In re Semcrude, L.P.,*
526 B.R. 556 (D. Del. 2014), *aff'd,* 648 F. App'x 205 (3d Cir. 2016) ...................... 11, 12

*In re Sierra Steel, Inc.,*
96 B.R. 275 (B.A.P. 9th Cir. 1989) ............................................................................... 9, 15

*In re Tronox Inc.,*
503 B.R. 239 (Bankr. S.D.N.Y. 2013) ............................................................................ 12

*In re Waccmaw's Homeplace,*
325 B.R. 524 (Bankr. D. Del. 2005) .......................................................................... 14, 15

*Kipperman v. Onex Corp.,*
411 B.R. 805 (N.D. Ga. 2009) ......................................................................................... 12

*Matter of Lamar Haddox Contractor, Inc.,*
40 F.3d 118 (5th Cir. 1994) ............................................................................................. 15

*Moody v. Security Pac. Bus. Credit, Inc.,*
971 F.2d 1056 (3d Cir. 1992) ..................................................................................... 11, 12

**STATUTES**

11 U.S.C.,
Section 101(32)(B) ............................................................................................................. 9

11 U.S.C.,
Section 101(15) ................................................................................................................ 11

11 U.S.C.,
  Section 544 .................................................................................................................... 1

11 U.S.C.,
  Section 547 .................................................................................................................... 1

11 U.S.C.,
  Section 548 .................................................................................................................... 1, 10

11 U.S.C.,
  Section 548(a)(1)(B) ..................................................................................................... 10

11 U.S.C.,
  Section 548(a)(1)(B)(i) ................................................................................................ 11

11 U.S.C.,
  Section 548(a)(1)(B)(ii)(II) ......................................................................................... 1

11 U.S.C.,
  Section 550 .................................................................................................................... 1

California Civil Code,
  Section 3439.05 ............................................................................................................ 1

California Corporations Code,
  Section 16957(a) .......................................................................................................... 1

**OTHER AUTHORITIES**

Uniform Fraudulent Transfer Act,
  Section 3, comment 2, 7A U.L.A. 639 (1985) ........................................................... 11

iii

2985346_2

Plaintiff James Gansman, the Liquidating Trustee (the "Trustee") of the Sedgwick LLP Liquidating Trust, hereby submits his post-trial brief regarding the claims for return of distributions and avoidance and recovery of constructive fraudulent transfers against the defendants James Keale ("Keale") and Michael Tanenbaum ("Tanenbaum," together with Keale, the "Defendants"). The Trustee brought these actions against the Defendants to recover funds that were paid solely as returns of capital to them in 2017 after Sedgwick LLP ("Sedgwick" or the "Debtor") had unreasonably small capital and/or was insolvent. These causes of action were brought under Cal. Corp. Code § 16957(a), and 11 U.S.C. §§ 544, 547,[1] 548, and 550.

The Court held a three-day bench trial in this matter, and most of the facts, stipulated to before trial and presented at trial, are undisputed. As discussed at trial and explained herein, the Trustee seeks a finding that: (1) Sedgwick did not receive reasonably equivalent value in 2017 from Defendants in exchange for the payments of capital they received from the Debtor; (2) Sedgwick had unreasonably small capital and was "doomed to fail" when it made its first distributions of approximately $475,000 to Defendants on January 13, 2017 (and at all times thereafter), a mere four days after Sedgwick knew that it would be losing 46% of its *net income* (on top of dismal prior year performance and reduced projections for 2017); (3) Sedgwick was insolvent under a fair valuation analysis as of January 31, 2017; and (4) if Sedgwick were to be dissolved (*i.e.*, liquidated) on January 13, 2017, its total assets would be less than its total liabilities. Based upon the admissible evidence, the "unreasonably small capital" test dictates a finding against Defendants at the time of the first payment made to them, thus mandating avoidance of all distributions made to the Defendants in 2017 as constructive fraudulent transfers, 11 U.S.C. § 548(a)(1)(B)(ii)(II); Cal. Civ. Code § 3439.05.

The evidence is unequivocal and undisputed. Two of the three really profitable offices—accounting for 46% of Sedgwick's net income—advised Sedwick on January 9, 2017 that they would be leaving *en masse* by the end of January. This devastating news came *after* Sedgwick failed to come close to its revenue goals in 2016, *after* receiving loan default notices, and *after* Sedgwick had deferred millions of dollars owed to its retirees. Sedgwick's financial picture changed: it immediately

---

[1] The Trustee has decided not to pursue the claim for avoidance of preferential transfer under § 547.

advised the remaining partners that they would have to take sizeable pay cuts, which itself resulted in additional partners defecting and further breaches of its loan covenants (an insufficient number of equity partners and cash flow [Trial Exhibits ("TE") 46, 47]); and barring a miracle (a merger with another firm) Sedgwick would fail—all stemming from the events of January 9, 2017.

What quibbles Defendants' expert, Paul Regan ("Regan"), could muster with respect to the analysis performed by Trustee's expert Austin Wade ("Wade"), he could not identify any other event that led to the demise of Sedgwick.  While Wade performed a detailed solvency analysis, Regan inexplicably declined to perform an impairment analysis based solely upon the fiction that Michael Healy ("Healy"), Sedgwick's Chairman, and Gregory Read ("Read") testified that Sedgwick was "doing pretty well" in January 2017.  Trial Tr. at 400:6-22.  However, the necessary foundational testimony does not exist in the record (assuming either Healy or Read were solvency experts): First, Regan speculated as to what Healy advised partners at a 2017 partner retreat and relied on the mere existence of the firm retreat as some evidence of solvency [*id.*, at 346:12-18]; and Read's testimony was not even proffered as evidence.  *Id.* at 256:7-15.  Regan purposely avoided delving into facts and financials (and even failed to convert GAAP "book values" to "fair values") in deference to Healy's pie-in-the-sky hopes notwithstanding the testimony of Christopher Marks ("Marks") that Sedgwick management misled the partners about Sedgwick's dire financial picture [*id.* at 59:1-61:13] and Healy telling the firm's CFO to make projections "as good as you possibly can." *Id.* 49:13-16.

Only one of the experts considered Sedgwick's true financial situation and applied the proper "fair value" analysis: the projected 46% loss of net income going forward, coupled with repeated failures to meet revenue targets, loan defaults, an inability to pay monies owed to retirees, a massive pay cut to remaining partners ($17,000 a month draws as of January 2017), and the effect that pay cut had on further defections in conducting a solvency analysis.  Sedgwick returned capital to Defendants at a time when it did not have money to pay its remaining partners or its retirees (and no reasonable expectations of sufficient revenue going forward).  The reduction or delayed payment to existing partners was borrowing from them to pay departed partners when it needed the fidelity of the existing partners to have any chance to survive the existential crisis.  The loss of the Newark and Dallas partners and offices doomed Sedgwick to fail when it had unquestionably insufficient capital

1  to survive when it began returning capital to Defendants in 2017.  Neither Regan nor Defendants

2  identify any other cause of the firm's ultimate demise.

3  **I.  PARTIES**

4  At trial, the Trustee proceeded against Tanenbaum seeking the return of $957,033.40, which

5  Tanenbaum stipulated was a return of capital made to him in 2017 after he announced he was leaving

6  Sedgwick, and against Keale for $261,679.01, which Keale stipulated was a return of capital made to

7  him under identical circumstances as Tanenbaum.   The Trustee submits that the clear evidence at

8  trial entitles him to judgments against Tanenbaum and Keale on his claims for relief in the total

9  amounts identified above (based upon an insufficient capital as of January 13, 2017) or $582,171.40

10 from Tanenbaum and $162,450.76 from Keale (based upon insolvency as of January 31, 2017).

11 **II.  EVIDENCE PRESENTED AT TRIAL PROVES LIABILITY FOR CONSTRUCTIVE**

12 **FRAUDULENT TRANSFER**

13 **A.  Pre-Trial Stipulated Evidence**

14 On January 9, 2017, seven equity partners, including the Defendants, provided formal notice

15 to Sedgwick that they were withdrawing from the firm.  Docket No. 15 ("JPS"), at 8:1-4, 8:14-16.

16 Along with the seven equity partners, most of the Dallas and Newark offices' non-equity partners,

17 associates, and staff also departed from Sedgwick in January 2017.  *Id.*, at 8:5-18.

18 The Dallas and Newark offices represented approximately 46% of the Debtor's net income,

19 which was lost in January 2017.  *Id.*, at 8:23-24.  Between January to March 2017, eleven equity

20 partners departed the Debtor's partnership as well as non-equity partners, associate attorneys, and

21 staff.  Debtor's management estimated that annual revenue related to the departing attorneys was

22 approximately $38 million, or approximately 25% of the 2016 gross revenue.  *Id.*, at 8:27-9:2.

23 By March 31, 2017, the Debtor's internal financial statements indicated that the Debtor's

24 total cash dropped by over 70% to approximately $2.9 million, where it had been in the range of $10

25 million to $20 million at all relevant times before.  *Id.*, at 9:12-14; *id.*, at 9:15-18 (showing massive

26 revenue decline through 2017).  By December 31, 2017, the Debtor's actual cash-based 2017

27 revenue was down $52.7 million or 31.5% vs. 2016, per the CPA reviewed financials.  *Id.*, at 9:21-

28 22.  The internal financial statements indicate that the firm had 2017 losses of approximately $14.3

3

million on a modified accrual basis, and lost money during most months in 2017 [*id.*, at 9:23-24] even though remaining partners were only receiving minimal draws (discussed below).

The Debtor ceased operations on December 31, 2017 [*id.*, at 9:19-20], less than a year after the events of January 9.  The Debtor filed its bankruptcy case on October 2, 2018 (the "Petition Date").  *Id.*, at 6:8-9.  In the Debtor's amended bankruptcy schedules, the Debtor scheduled assets of $3,528,809.69 and liabilities of $69,308,897.99. *Id.*, at 6:10-11.  The total scheduled liabilities for lease claims are $66.2 million.  In the bankruptcy case, the total amount of lease claims filed against the Debtor's estate was approximately $40.4 million, with $35.1 million related to office lease claims and $5.3 million related to office equipment lease claims.  *Id.*, at 6:15. The total amount of claims filed against the Debtor's estate to date is approximately $46.1 million. *Id.*, at 6:21.

**B.   <u>Evidence Presented at Trial</u>**

Healy was an attorney at Sedgwick for approximately 37 years, and he was the Chairman from 2015 until the firm's dissolution in 2017-2018. Trial Tr. at 31:2-32:19. Healy testified that the practice of law was becoming more challenging in the last 10-15 years prior to Sedgwick's dissolution because clients were more demanding of law firms, clients were becoming less loyal to their law firms, and clients were more focused on costs rather than quality of legal services.  *Id.* at 34:14-35:4. Equity partners at Sedgwick would vote on compensation of partners and associates for the firm, and in 2016, the firm began to look closely at "chronic underperforming non equity partners." *Id.* at 35:25-37:10. Healy testified that the announcement of the Newark and Dallas partners' departures from Sedgwick was "surprising" to him because he and the firm did not see it coming and the firm had no notice of the departures before January 2017.  *Id.* at 43:21-44:17. The Newark partners did not have any authorization to solicit each other or others at their office prior to their joint withdrawal announcement on January 9, 2017.  *Id.* at 89:4-24.

With the Newark and Dallas departures, "it changed the financial picture of the firm" and the Executive Committee became "very keenly interested in the financial performance of the firm," exploring all available options.  *Id.* at 38:25-39:11. After the Newark and Dallas departures, Healy testified that the firm hired a headhunter to consider options, considered merger possibilities, partial merger possibilities, and splitting the firm in various pieces via practice groups, and streamlining

down the operations to eliminate a number of offices.  *Id.* at 39:12-22.  Defendant Keale, who was on the Executive Committee until the end of December 2016, testified that the Executive Committee had authority to reserve Sedgwick's net income to set aside funds for "a rainy day" where a significant event may impact the firm's future financial condition, but Keale did not disclose the Newark departure that would have necessitated a reservation of profits during the Executive Committee meeting in December 2016. *Id.* at 89:25-91:2.

Healy testified that Sedgwick was "left with a fair amount of overhead" from losing the productive Newark office in January 2017, including needing to pay some of the Newark office rent, paying certain benefits for the attorneys and staff to depart the firm, and paying for a large administrative office with less productivity.  *Id.* at 40:25-42:7.  Healy testified that he discussed with Sedgwick's CFO the creation of an analysis of the financial impact of the Newark and Dallas departures, and Healy testified that he discussed with the CFO to "do an analysis on the financial impact and make it as good as you possibly can."  *Id.* at 48:22-49:24. The superficial financial analysis presented to equity partners indicated that the best-case scenario was if the firm sustained its financial performance by keeping the remaining lawyers at the firm and keeping them working productively, while working to reduce the firm's overhead.  *Id.* at 50:2-18.

Marks, the Sedgwick Seattle managing partner throughout 2017, testified that he felt he had been misled by the Executive Committee, its projections, and the merger options, but that those misrepresentations kept him working hard at Sedgwick until the end of 2017. Trial Tr. at 57:24-58:25, 60:2-61:13. Marks testified that the Newark and Dallas departures required Sedgwick to drastically reduce partner compensation, including eliminating quarterly tax draws, only paying "minimum draws" to remaining equity partners in 2017 [*id.* at 60:2-61:13], which caused other partners to leave Sedgwick "in droves" and that "people started bailing." *Id.* at 59:1-60:1.

The Trustee's forensic accounting expert testified that he has been in general accounting for 20 years, has been a partner at an accounting firm for 15 years, and he is a certified public accountant (CPA), a certified fraud examiner (CFE), and he is accredited in business valuation (ABV). Trial Tr. at 101:3-25. Unlike Regan, Wade testified that he reviewed Sedgwick's bankruptcy schedules, tax returns, CPA-reviewed internal financial statements, internal trial balance reports by month, and other

5

available financial documents. *Id.* at 109:23-111:2; *see* TEs 25, 26, 28, 39, 40, 44, 45, 50, 85. Wade's ultimate opinion on solvency is that Sedgwick was balance sheet insolvent by approximately $40 million as of January 31, 2017 and all times thereafter. Trial Tr. at 112:21-24. Wade used the first test date of January 31, 2017 because that was the first date with good internal financial information where it was known that Sedgwick had lost the Newark and Dallas offices. *Id.* at 113:1-14.

Critically, Wade testified that Sedgwick had been in a general financial decline for several years prior to 2017, with its gross revenue decreasing by approximately 7% each year between 2013 to 2016. *Id.* at 114:11-23, 115:4-20; TE 40. Wade testified that Sedgwick had bad third and fourth quarters in 2016, necessitating the firm's decision to reduce payments to retired partners by over 80%, and that firm leadership indicated that the firm was struggling to meet its already reduced budget for 2016. *Id.* at 119:1-18. Wade testified that the loss of the Dallas and Newark offices in January 2017 left Sedgwick with unreasonably small capital going forward and that those losses impaired the assets and liabilities and Sedgwick's ability to pay into the future. *Id.* at 114:11-23. Wade's conclusions were based upon concrete financial information that reflected the decline preceding 2017, the sudden loss of net revenue generated by two of only three significantly profitable offices of Sedgwick leaving only one significantly profitable Sedgwick office, the fact the firm's cash quickly dissipated, the fact that Sedgwick could not pay monies owed to retirees, the fact that Sedgwick was surprised by the loss of substantial departures and could not instantly reduce its oversized overhead, the substantial reduction in remaining partner compensation, and the fact on an accrual basis that Sedgwick could not turn a profit in any month in 2017. *Id.* at 43:21-44:17, 57:24-61:13, 115:4-20, 120:4-121:8, 156:9-158:10, 275:11-21, 281:4-284:11; TE 40; TE 28.

Wade, through his review and analysis of the payments to partners, determined that in 2013-2014, equity partners received on average approximately $750,000 per year per equity partner, but that number declined to approximately $500,000 on average per equity partner in 2016, and this was cause for concern because the financial information and internal emails indicated that the firm was struggling to adequately compensate and retain its equity partners. *Id.* at 119:19-120:3. Wade testified that it was essential for Sedgwick, as a professional services firm, to adequately compensate its partners or else they would leave, which was corroborated by Healy's and Mark's testimony. *Id.*

6

at 57:24-61:13, 120:4-121:8, 286:4-287:4. After the loss of Newark and Dallas offices, Wade's analysis indicated that Sedgwick's profitability was affected immediately, because Sedgwick could not make a monthly profit on an accrual basis in 2017, and that the firm was unable to pay its equity partners approximately $500,000 per year on average, which effectively killed Sedgwick's business model as a law firm. *Id.* at 120:18-121:8; 156:9-158:10, 275:11-25, 276:13-279:13, 281:4-284:11, 286:4-287:4. Wade explained the differences between analyzing cash-basis financial information and accrual-basis financial information and that accrual is better for gauging the true current performance of a business, and thus, he used more of an accrual basis in his analysis of the firm's true performance. *Id.* at 121:9-122:13. Wade examined the CPA-reviewed financial statements of Sedgwick, TE 40, and he built that information into his insolvency analysis. *Id.* at 122:14-25. Because Sedgwick maintained its financial statements in a "modified cash basis," Wade converted these financial statements to an accrual basis in order to get a better understanding of the true current financial performance of the firm. *Id.* at 121:9-122:13, 123:15-125:8, TE 40 at p. 47.

Wade's balance sheet test insolvency analysis is contained on TE 20, admitted in evidence at trial. Wade supported each of the adjustments made in his insolvency analysis, as follows:

*First*, Wade explained why he reduced Sedgwick's accounts receivable (AR) and work in progress (WIP) assets by 30% to arrive at a fair market value. *Id.* at 126:9-19. Wade reviewed the Sedgwick AR-Aging Report (TE 44), which showed Sedgwick's AR was 30%-40% over 90 days past due from the beginning of 2017 and throughout the year, and thus, in his experience, Sedgwick was unlikely to receive anything for amounts that were not current. Trial Tr. at 126:9-19, TE 44. Thus, Wade believes that a 30% reduction in AR and WIP was reasonable and represented a fair value amount for what Sedgwick was likely to receive from a hypothetical and willing buyer of these assets. *Id.*, TE 20 and 44.

*Second*, Wade explained his reduction of fixed assets to no fair value because these assets were primarily leasehold improvements, furniture, and equipment. In Wade's experience these assets have no market value for which a buyer would be willing to pay, as generally companies are not able to sell leasehold improvements or used furniture. Trial Tr. at 126:22-128:15; TE 20; TE 40, p. 56.

*Third*, Wade explained that on Sedgwick's financial statements it disclosed future lease

obligations of $90,677,949 on the consolidated financial statements ending on December 31, 2016. TE 40 at p.36; Trial Tr. at 130:20-131:25. Wade explained that he reduced or discounted the total lease obligations by 50% to arrive at the fair value in his insolvency analysis, showing an office lease liability of $45,338,975.  *Id.*; *see* TE 20. Wade explained that he did a lot of research to determine that 50% was the "fair value" for these office leases, including reviewing articles regarding office lease obligations.  *Id.* at 132:1-21. He testified that the Debtor was contractually obligated to pay $90.6 million in January 2017, which it could not afford, but despite Sedgwick not being able to afford these obligations, there were ways to mitigate the total liability.  *Id.*  Wade explained that his research showed that Sedgwick could likely sublease their office spaces at a discount between 15-40%, but that there would be other costs, such as lead times to sublease, broker commissions, and moving costs, which would add approximately 10% as a cost as well.  *Id.* Wade's research showed that realistically Sedgwick might get back fifty cents on the dollar as a fair value for subleasing its lease obligations, which meant that using a "fair value" analysis, Sedgwick might be able to mitigate its lease obligations by 50%, hence the 50% reduction.  *Id.* Wade explained that you could also characterize the 50% reduction as a 50% asset against the total obligation—meaning the $90.6 million obligation would be reduced by the $45.3 million asset for subleasing, which as Regan testified, could be called a "right of use" asset—but either way it would be the same net effect for determining "fair value."  *Id.* at 132:22-133:24, 171:17-172:10.  Wade testified that even if the fair value of the lease obligations was reduced by over 90% to 6.5 cents on the dollar, Sedgwick still would have been balance-sheet insolvent on January 31, 2017.  *Id.* at 134:4-17.

*Fourth*, based on the disclosure in the Debtor's financial statements, Wade testified about his inclusion of the retired partner payment obligations on his "fair value" balance sheet test, at a total liability of $22.2 million.  *Id.* at 134:23-135:12; TE 20; TE 40 at p. 37. Wade testified that Sedgwick was contractually obligated to pay these amounts to retired partners, and the firm paid over $1.8 million to retired partners in 2016. Trial Tr. at 135:9-20. Wade explained that Regan's reports argued the retired partner obligations should be excluded from an insolvency analysis because of the footnote at the end of the 2017 financial statements that stated the "retirement arrangements were terminated concurrent with the decision to dissolve the Firm effective December 31, 2017."  *Id.*

8

136:1-137:18. Wade testified that Regan improperly failed to use a going concern analysis to determine the "fair value" of this liability and that his *post hoq* liquidation value after the decision was made to dissolve the firm was improper. *Id.* at 137:19-139:1.

*Fifth*, Wade explained that he did not reduce the equipment lease liability of $5.6 million on his insolvency analysis because this amount was for office equipment, which is basically financing disguised as "leases" in order to allow Sedgwick to not need to include it on its balance sheet, but that it is not a true lease for which Sedgwick can receive any value for or sell to a hypothetical buyer. *Id.* at 170:16-171:16.  On this, Regan agreed. *Id.* at 386:1-14.

Based on Wade's fair valuation analysis of Sedgwick's books, records, and financial statements, he determined that as of January 31, 2017 the fair value of Sedgwick's assets was $43,631,857 and that the fair value of Sedgwick's liabilities was $83,291,063—demonstrating that Sedgwick was insolvent under a "fair valuation" by approximately $39,659,206.  TE 20.  He further concluded that the events of January 9, 2017 rendered Sedgwick doomed to fail and not in a position to return any capital to Defendants beginning on January 13, 2017.  Trial Tr. at 160:15-161:9.

Inconsistent with his prior law firm solvency analyses, here Regan used a generally accepted accounting principles ("GAAP") methodology in forming his opinions about Wade's insolvency analysis.  Trial Tr. at 325:19-22. However, as Wade explained, a GAAP methodology would help to arrive at the accounting "book value" of assets and liabilities—not the "fair value" of those assets and liabilities.  *Id.* at 129:2-130:8. Wade explained that in order to determine the fair value of assets and liabilities, one would need to convert "book value" to "fair value" in analyzing what they could be sold for a hypothetical price to a hypothetical willing buyer. and what the debtor would receive as a cash equivalence.  *Id.*; *see also* 11 U.S.C. § 101(32)(B); *see also In re Sierra Steel, Inc.,* 96 B.R. 275, 278 (B.A.P. 9th Cir. 1989) ("[A]lthough GAAP are relevant, they are not controlling in insolvency determinations.").  Regan never performed the next step of converting book value to fair value.  Despite finding insolvency in other cases where there was a sudden substantial reduction in net income and agreeing that "certainly [he] could have" tested for impairment in January 2017 and that he "wouldn't ignore" the loss of the Newark and Dallas offices if he had done a solvency analysis—his testimony in fact ignores these events. Trial Tr. at 396:8-397:10; 400:6-22, 401:4-17.

9

## III.    LEGAL ANALYSIS OF AVOIDANCE CLAIMS

### A.    Trustee's Burden of Proof

The Trustee bears the burden to prove his claims by a preponderance of the evidence. *See In re 3dfx Interactive, Inc.*, 389 B.R. 842, 863-64 (Bankr. N.D. Cal. 2008).  At trial, the Defendants' counsel often appeared to be arguing for a heightened standard, beyond a reasonable doubt.  Here, the Trustee submits that he has exceeded his burden in demonstrating that it is more likely than not that Sedgwick had unreasonably small capital as of January 13, 2017 and that it was insolvent as of January 31, 2017.  Thus, the Debtor's distributions to the Defendants are avoidable as constructive fraudulent transfers under the Bankruptcy Code and as returns of distributions under California law, which distributions are recoverable for the benefit of the creditors of the Debtor's liquidating trust.

### B.    The Undisputed Elements of the Trustee's Constructive Fraudulent Transfer Claims

The elements for constructively fraudulent transfers under 11 U.S.C. § 548(a)(1)(B) are that the Trustee may avoid the distributions made within two years of the Debtor's petition date, if the Debtor voluntarily or involuntarily:

> (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; **AND**
>
> (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
>
> (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;
>
> (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; **OR**
>
> (IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. § 548(a)(1)(B) (emphasis added).

It is undisputed that all of the distributions sought to be avoided occurred within two years of Sedgwick's Petition Date.  JPS, at 10:13-11:15.  It is undisputed that Sedgwick received less than reasonably equivalent value in exchange for the distributions to the Defendants, which were based on equity in the limited partnership and constituted returns of capital.  *Id.*

10

2985346_2

"Under the Bankruptcy Code, limited partnership interests are classified as 'equity security.'" *In re Agricultural Research and Tech. Grp., Inc.*, 916 F.2d 528, 540 (9th Cir. 1990) ("*Agretech*") citing 11 U.S.C. § 101(15).  If partnership distributions are made on account of the partnership interests, as opposed to being made in exchange for a debt owed to a partner, then as a matter of law the distributions were not "for value." *Agretech*, 916 F.2d at 540. Importantly, the Ninth Circuit observed that the purpose of constructive fraudulent transfer claims is "to protect the creditors" in determining the "value" that is purportedly exchanged. *See id.* ("Any consideration not involving utility for the creditors does not comport with the statutory definition.") citing the Unif. Fraudulent Transfer Act § 3, comment 2, 7A U.L.A. 639, 651 (1985). "Thus, distributions to limited partners is not value because any other definition would not further protection of creditors." *Agretech* at 540. Ninth Circuity authority holds "that a distribution on account of a partnership interest relative to an investor's capital contribution was not 'reasonably equivalent value' as defined by the Bankruptcy Code." *In re AFI Holding, Inc.*, 525 F.3d 700, 704 (9th Cir. 2008) (citing *Agretech* at 540).

Thus, it is undisputed that the Trustee has satisfied the element under Section 548(a)(1)(B)(i), and the only remaining disputed elements are the disjunctive ones under Section 548(a)(1)(B)(ii).

## C.      "Unreasonably Small Capital"

Sedgwick was engaged or was about to engage in business for which its remaining capital was unreasonably small in relation to its business. *See* § 548(a)(1)(B)(ii)(II). "Unreasonably small capital" describes a financial condition that is short of equitable insolvency and that refers to an inability to generate sufficient profits and cash flow to sustain operations. *In re Semcrude, L.P.*, 526 B.R. 556, 560 (D. Del. 2014), *aff'd*, 648 F. App'x 205 (3d Cir. 2016) (citing *Moody v. Security Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1070 (3d Cir. 1992)); *In re AWTR Liquidations, Inc.*, 548 B.R. 300, 313, 331 (Bankr. C.D. Cal. 2016) ("[A] corporation may be currently paying its debts and have assets that exceed present liabilities, nevertheless it can be doomed to fail…and therefore be insolvent under the inadequate capital test."); *In re Palm Beach Fin. Partners, L.P.*, 598 B.R. 885, 890 (Bankr. S.D. Fla. 2019), *aff'd*, 616 B.R. 189 (S.D. Fla. 2020); *ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 397 (S.D. Tex. 2008). The test for whether a debtor is left with "unreasonably small capital," under a constructive fraudulent transfer claim, is based on "reasonable foreseeability"

11

where a debtor's financial condition is "technically solvent but doomed to fail." *Semcrude*, 526 B.R. at 560 (citing *Moody*, 971 F.2d at 1070). "Another factor the Court may consider is the length of time [a debtor] survived after the challenged transfer and whether the deterioration of the enterprise was affected by unforeseeable intervening events." *ASARCO*, 396 B.R. at 397 (citation omitted).

In *ASARCO*, the court found that even though the business survived for 28 months after the challenged transfer, the debtor had unreasonably small capital/assets at the time of the challenged transfer. *Id.* at 398. The court in *ASARCO* found that the business was able to survive by taking drastic measures, including stopping some operations. *Id.* at 399. The survival for over two years does not by itself demonstrate that a debtor has sufficient cash flow to meet its capital needs or that it is not "doomed to failure." *Id.* "Unreasonably small capital" means "difficulties which are short of insolvency in any sense but are likely to lead to insolvency at some time in the future." *In re Tronox Inc.*, 503 B.R. 239, 321 (Bankr. S.D.N.Y. 2013) (citations omitted).

The Trustee demonstrated at trial that Sedgwick had unreasonably small capital once the first and third most profitable offices, accounting for 46% of the firm's net income, announced their *en masse* departures led by seven equity partners (including Defendants).  JPS at 8:1-24. At that point, on January 9, 2017, it was reasonably foreseeable that Sedgwick would not be able to generate profits to sustain its operations on a go-forward basis.  Among other things, by that point Sedgwick: (i) already failed to make budget in 2016, (ii) already deferred millions owed to retirees, and (iii) now had to reduce partner compensation to minimum monthly draws ($17,000), the equivalent of $204,000 a year, far below what was necessary to be competitive and retain partners.  Trial Tr. at 164:21-165:11; *id*. at 59:1-61:13 (Mark's testimony that the distributions to remaining partners dropped substantially in 2017—only receiving minimum draws—and remaining partners began to leave the firm "in droves"); JPS at 11:13-14 (identifying $17k as monthly equity draw).

The evidence that the January 2017 departures led to the ultimate failure of Sedgwick is undisputed—there was no evidence demonstrating any other intervening or subsequent source of the downward spiral of the firm.  While there was argument presented by Defendants' counsel that Sedgwick existed for 85 years ["How fragile is that?" (Trial Tr. at 16:16-17)], that is not evidence of anything, and the fact that the firm voted to dissolve less than a year after the January 2017

departures (coupled with a drastic reduction in revenues in 2017) demonstrates the true impact of the firm's inability to generate sufficient profits to sustain its operations after the loss of 46% of its net income. After all, Sedgwick did not make it to the end of the same year before voting to dissolve, and the deterioration of the firm's business was not affected by any unforeseeable intervening events—and no unforeseeable intervening events were ever presented or argued by the Defendants. *See ASARCO*, 396 B.R. at 397.  Regan did not and could not identify or explain any event or other cause—other than these January departures—that led to Sedgwick's demise.

Wade testified about the annual average distributions per equity partner, which showed substantial decreases in distributions and profits year over year from 2013 to 2017. Trial Tr. at 119:19-121:8.  Wade testified that in order sustain its business model, Sedgwick needed to pay at least $500,000 per equity partner on average per year, and that upon the announcement of the departures of the Newark and Dallas offices it was reasonably foreseeable that the firm would not make sufficient profits to sustain its operations and average equity partner distributions would fall woefully short of the $500,000 threshold. *Id.* at 119:19-121:8, 281:4-284:11; TE 26; TE 28.

Moreover, the evidence shows that Sedgwick knew it was in financial trouble upon the announcement of the departures on January 9, 2017.  Healy described it as "surprising" and testified as to the measures taken to keep the firm afloat while it looked for a lifeline, which included hoping for a merger with a different firm.  However, there is no evidence that demonstrates the firm's optimistic projections were reasonable or that the projections were, in fact, sufficient enough to generate sufficient cash flow to sustain its operations (or that the firm met the overly optimistic 2017 projections).  Equity partners, such as Marks, felt they had been misled by these projections and Healy testified that he instructed the firm's CFO to make the projections "as good as you possibly can."  After the January 9, 2017 withdrawal announcements by the Newark and Dallas offices, more partners and more offices began to "bail" and leave "in droves," and the stopping of some of these operations allowed Sedgwick to survive longer but, ultimately, the difficulties faced on January 9, 2017 led an 85-year-old law firm to vote to dissolve 11 months later (*see* TE 40 at p.52).

While the Defendants' expert attempted to nitpick Wade's analysis, Regan's testimony was propped up largely by conjecture bereft of any credible financial analysis—wholly dodging

13

Sedgwick's unreasonably small capital condition.  The Defendants' entire strategy at trial focused on an expert, Regan, who did not conduct an impairment analysis and form his own independent opinion, relying upon hearsay from unqualified lay people. Trial Tr. at 256:17-257:7, 346:6-25, 366:2-8, 396:8-397:10; 400:6-22, 401:4-17. Regan wore blinders ignoring that the departures of Newark and Dallas was a mortal wound that exacerbated Sedgwick's ongoing inability to pay retiree obligations and prior loan defaults, required an immediate and drastic reduction in partner compensation and led to a sharp revenue decline.  Sedgwick's unreasonably small capital, dooming it to fail, remains undisputed; after years of decline, the sudden and unexpected loss of two of the most profitable offices left it incapable by January 13, 2017 of generating sufficient profits to sustain operations including, notably, paying its partners below competitive compensation.

Sedgwick was doomed to fail upon the formal announcement of the departure of the Newark and Dallas partners because, as testified to, it was reasonably foreseeable that the firm would not generate sufficient profits to keep the doors open and the ship afloat.  Sedgwick could not simply walk away from its fixed overhead, and its immediate efforts to right the ship by substantially reducing partner compensation only further exacerbated its dilemma.  Sedgwick hit an iceberg on January 9, 2017, from which it could never recover, no matter what emergency measures were taken. Sedgwick's chairman testified that the partners and executive committee did everything to try to prevent the firm's failure, but despite their best efforts, failure and dissolution of the partnership was destined following the formal announcement of the January 2017 departures—on January 9, 2017.

### D. "Insolvency"

In addition to the undisputed testimony that Sedgwick had unreasonably small capital to sustain its operations after the announcement of the January 2017 departures, the Trustee presented sufficient evidence to demonstrate and find that Sedgwick was insolvent as of January 31, 2017, based on the balance sheet insolvency test presented and testified to by Austin Wade.

The "balance sheet test" contemplates a "fair valuation" for the respective assets and liabilities, as opposed to what is specifically listed on the debtor's balance sheet under generally accepted accounting principles ("GAAP"). *In re Waccmaw's Homeplace*, 325 B.R. 524, 529 (Bankr. D. Del. 2005) ("Accounting conventions are not the controlling principles for the legal determination

14

of whether a debtor's debts exceed the fair value of its assets for purposes of insolvency.") (citations omitted); *Matter of Lamar Haddox Contractor, Inc.*, 40 F.3d 118, 121-22 (5th Cir. 1994) (evidence of book value does not establish the fair market value of the debtor's assets). Under "fair value," "the inquiry must be to what extent an asset would have value for a creditor attempting to satisfy its claim." *In re Richmond Produce Co.*, 151 B.R. 1012, 1019 (Bankr. N.D. Cal. 1993) (stating that GAAP does not control the determination of solvency because there are assets included under GAAP that cannot be sold to satisfy claims of creditors); *see also Sierra Steel*, 96 B.R. at 278.

Relying on the undisputed facts, the Debtor's financial statements, and deposition testimony of former partners at Sedgwick, the Trustee demonstrated the date of Sedgwick's insolvency through the expert testimony of Wade, who conducted a ground-up comprehensive solvency analysis of Sedgwick. Defendants did not present any evidence of insolvency, ground up or otherwise.

Based on Wade's fair valuation analysis of Sedgwick's books, records, and financial statements, he determined that as of January 31, 2017 the fair value of Sedgwick's assets was $43,631,857 and that the fair value of Sedgwick's liabilities was $83,291,063—demonstrating that Sedgwick was insolvent under a "fair valuation" by approximately $39,659,206. TE 20. Wade's analysis is supported by his testimony at trial, and by the documentary evidence, showing that the Debtor's liabilities were substantial, even with a substantial reduction in the office lease liabilities. Importantly, Wade testified that even if the office lease liability was reduced by over 90%, Sedgwick still would be insolvent—there is no evidence that demonstrates otherwise, since Regan only attempted to rebut Wade's 50% justified reduction. Trial Tr. at 134:4-12. Further, Regan's attempts to exclude Sedgwick's most significant obligations and liabilities by using a GAAP methodology has no basis in a fair valuation analysis. *Waccmaw's Homeplace*, 325 B.R. at 529.

## IV.   CONCLUDING REMARKS

Based on the foregoing, the Court should enter judgment in favor of the Trustee on his claims for relief, including finding that Sedgwick had unreasonably small capital as of January 13, 2017 or earlier, avoiding the distributions of $957,033.40 to Tanenbaum and $261,679.01 to Keale, plus pre-judgment interest. The Court should also find that Sedgwick was insolvent as of January 31, 2017, avoiding the distributions of $582,171.40 to Tanenbaum and $162,450.76 to Keale, plus interest.

15

1  | Dated:  May 24, 2024                    BG LAW LLP

2  | By:  /s/ Ryan F. Coy
3  |                                         DAVID M. POITRAS
   |                                         JASON B. KOMORSKY
4  |                                         RYAN F. COY
   |                                         Special Litigation Counsel for Plaintiff, James
5  |                                         Gansman, as liquidating trustee of Sedgwick
   |                                         Liquidating Trust
6  |

16

## CERTIFICATE OF SERVICE

I declare that I am over the age of 18 years and not a party to the within action.  I am employed in the County of Los Angeles and my business address is BG Law LLP, 21650 Oxnard Street, Suite 500, Woodland Hills, California 91367.

On **May 24, 2024**, I served the following document(s):

**PLAINTIFF LIQUIDATING TRUSTEE'S POST-TRIAL BRIEF**

On the following:

ALL COUNSEL OF RECORD
(via CM/ECF electronic service list)

☒       By transmitting electronically via CM/ECF the document(s) listed above as set forth on the electronic service list on this date before 11:59 p.m.

☒       By delivering to copies to:

Hon. Judge Freeman, District Court, Northern District, San Jose Courthouse, Courtroom 3 – 5th Floor, 280 South 1st Street, San Jose, California 95113

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.  Executed on May 24, 2024, at Woodland Hills, California.

/s/ Abbie Au
ABBIE AU

17

2985346_2